Filed 10/21/13  P. v. Casillas CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062069 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD231927) |
| MANUEL ANGEL CASILLAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Einhorn, Judge.  Affirmed.

Buckley & Buckley and Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Manuel Angel Casillas and his codefendant girlfriend, Isis Martinez (who is not a party to this appeal), of three felony offenses:  (1) first degree

robbery in an inhabited dwelling (Pen. Code,[1] §§ 211, 212.5, subd. (a)); (2) first degree residential burglary (§§ 459, 460); and (3) unlawful taking or driving of a motor vehicle (Veh. Code, § 10851, subd. (a)).[2] The jury found not true allegations that Casillas personally used a firearm during the commission of the robbery (§ 12022.53, subd. (b)) and the burglary (§ 12022.5, subd. (a)).

In a bifurcated proceeding, Casillas admitted allegations he had suffered two prison priors (§§ 667.5, subd. (b), 668), one serious felony prior (§§ 667, subd. (a)(l), 668, 1192.7, subd. (c)) and one strike prior (§§ 667, subds. (b)-(i), 1170.12, 668).

The court thereafter sentenced Casillas to an aggregate state prison term of 14 years four months, consisting of a term of eight years for his robbery conviction, plus a consecutive term of one year four months for his conviction for unlawfully taking or driving a motor vehicle; plus a consecutive term of five years for the serious felony prior. The court stayed under section 654 the sentence for Casillas's first degree burglary conviction, and struck the two prison priors.

Casillas appeals, contending (1) his robbery conviction must be reversed because there is insufficient evidence that the robbery was a natural and probable consequence of the target crime of residential burglary; (2) his robbery conviction must be reversed

---

[1] Undesignated statutory references will be to the Penal Code.

[2] A charge of grand theft of an automobile (§ 487, subd. (d)(l)) was withdrawn by the prosecution prior to closing arguments. A charge of receiving, concealing or withholding a stolen vehicle (§ 496d) was alleged as an alternative to the unlawful taking or driving a motor vehicle charge. The jury did not have to return a verdict as to the receiving, concealing or withholding of a stolen vehicle charge because it convicted Casillas and Martinez of the unlawful taking or driving charge.

because the court erred by failing to sua sponte instruct the jury on theft as a lesser included offense of robbery; and (3) the court erred by not staying under section 654 the execution of the consecutive term of one year four months it imposed for his conviction for unlawfully taking or driving a motor vehicle because the taking of the vehicle was intended to be a means of fleeing from the scene of the residential burglary and robbery, and, thus, of completing those offenses. We affirm the judgment.

## FACTUAL BACKGROUND

### A. *The People's Case*

On January 18, 2011, between 2:30 and 3:00 p.m., Gilbert Trujillo and his wife, Gloria Trujillo[3] (together the Trujillos), returned to their home on Thrush Street in San Diego. As Gloria went to the back bedroom, she saw Casillas and Martinez in the doorway of the bedroom. Casillas pointed what appeared to be a shotgun or rifle at Gloria as she ran back to the front room, and then he pointed it at Gilbert.[4] Gilbert told Casillas, "[P]lease don't . . . kill us. You can take anything you want." Casillas responded by saying, "Shut up." Gilbert started throwing bar stools at Casillas and they started to fight.

Gloria tried to call the police, but Martinez knocked the phone from her hand and told her she was not going to call anyone. Martinez then grabbed Gloria's purse from her

---

[3]     In the interest of convenience and clarity, we shall refer to Gilbert Trujillo and Gloria Trujillo by their first names. We intend no disrespect.

[4]     As Casillas's attorney pointed out during closing arguments, the evidence showed that, although the police found a live 12-gauge shotgun shell in the pair of pants they located inside the stolen van, they found no gun.

arm, Gloria ran out of the house to get help and soon thereafter she saw Martinez running away up Thrush Street. Gloria testified she was scared when Martinez took the purse from her. Gloria's purse was later returned to her after it was located on the street several houses away. Nothing was missing from her purse.

Meanwhile, Casillas continued to fight with Gilbert and hit him in the forearm with the butt of the shotgun or rifle, knocking Gilbert to the ground. Gilbert got up and scratched Casillas's forehead, and Casillas ran from the house. Gilbert grabbed his crowbar, which he had left in the backyard but found on the floor inside his house, and went outside to find his wife. Gloria used a neighbor's phone to report the robbery to the police.

Shortly thereafter, Casillas and Martinez jumped into a white Nissan van that was parked in the driveway of a house on another street, Linnet Street, after Casillas found the keys to the vehicle hanging in the lock of a nearby gate, and drove away in it. The owner of the van, William Asher, who testified he had not given permission to anyone to take the van, called the police. Officers pulled the van over a few minutes later and arrested Casillas and Martinez. A video recording of the stop, taken from a police helicopter, was played for the jury.

About an hour later, the Trujillos identified Casillas and Martinez in a curbside line-up. Gilbert had seen Casillas a couple of weeks earlier, when Casillas came to the house asking to see Gilbert's adult son, Gilbert Trujillo Jr., whose nickname is Junior and who also lived in the home. Casillas told Gilbert that Junior owed him money. Also, on Christmas morning 2010, Gilbert had observed Casillas attempting to break a chain that

4

secured a lawnmower on the back of his truck. On that occasion, Casillas stole some tools from Gilbert's truck. Gilbert and Gloria testified they had not seen Casillas before the burglary. Casillas and Martinez did not have their permission to be in the home on the day of the burglary.

Several dresser drawers in the Trujillos' bedroom had been emptied onto the floor, and some boxes that covered a safe had been removed from the closet. The rear door of the house had been damaged. A white glove and a three-foot-long black bag that did not belong to the Trujillos were found in the living room. The police impounded those items.

Martinez told a paramedic that she and Casillas were hanging out at a friend's house, and they "freaked out" and ran out the back when someone came home. She also said she hurt her ankle when she fell over a fence or while running from the police. Martinez later told a nurse at the hospital that her ankle injury occurred while she was running away from police, when she fell while trying to climb over a fence.

Casillas was interviewed by a detective and, after he waived his *Miranda*[5] rights, admitted that he stole the van. However, he denied breaking into the Trujillo's home. Casillas told the detective his wallet and identification were in the van. Inside the pockets of a pair of jeans that were in the van, the detective found nine used syringes, Casillas's identification card, and a live 12-gauge shotgun round. Casillas denied he had any weapons on the day of the burglary.

---

5       *Miranda v. Arizona* (1966) 384 U.S. 436.

DNA samples taken from underneath Gilbert's fingernails and from the glove and bag found in the living room matched Casillas's DNA.

B. *The Defense*

The defense presented the testimony of the Trujillos' son, Junior, who testified that he knew Casillas and owed him money. Junior admitted he lived in the converted garage apartment at the Trujillo's home, but denied that Casillas ever stayed at the house or that he (Junior) let anyone in the house on the day of the burglary.

Officer Steven Harrison testified that after he responded to the burglary call, Junior arrived home and said he had owed Casillas money a few weeks earlier but he had paid Casillas in full.

Manuel Hernandez, who was friends with Junior and had lived at the Trujillos' home for a brief period of time earlier in the year, testified the Trujillos were concerned that Junior was letting people come over to the house "at all hours of the day and night." He also testified that Junior told him he had let Casillas stay at the house for less than a week in 2010. Casillas had only used the side entrance to the garage apartment and Junior's parents did not know Casillas stayed there.

Casillas's cousin testified that he picked Casillas up and dropped him off at the Trujillos' home while Casillas was staying in the garage apartment in late 2010 for a month or two.

A district attorney investigator testified that he was unable to find a record that Gilbert had reported a theft at his home around Christmas 2010.

6

DISCUSSION

## I. *SUFFICIENCY OF THE EVIDENCE* (*ROBBERY*)

Casillas first contends his robbery conviction must be reversed because there is insufficient evidence that the robbery was a natural and probable consequence of the target crime of residential burglary. We reject this contention.

A. *Background*

Gilbert testified that Casillas pointed a "shotgun or some type of rifle" at Gloria and him when they encountered Casillas inside their home. Gloria testified Casillas was holding a shotgun or gun, which he pointed at Gilbert and her. Gilbert also testified he told Casillas, "[P]lease don't . . . kill us. You can take anything you want." Gloria told the jury she was scared when Martinez took the purse from her.

Although it is undisputed the police found no gun in this matter, the prosecution presented evidence that Casillas admitted to the police that he stole Asher's van, and that his (Casillas's) wallet and identification were in the van. The prosecution also presented evidence that the police impounded a live 12-gauge shotgun shell they located in a front pocket of a pair of jeans they found inside the van and that the shotgun shell was found in the same pocket in which they found Casillas's wallet and identification.

During closing arguments, with respect to the robbery charge, the prosecutor argued that Martinez was guilty of robbery because she used both force and fear to take Gloria's purse. Specifically, the prosecutor argued Martinez used force when she "initially rip[ped] the phone away from [Gloria]," and then "remove[d] the purse forcefully from Gloria's arm." The prosecutor also argued Martinez used fear because

7

Casillas was armed with a shotgun and was fighting with Gilbert when she grabbed the purse from Gloria, who testified she was scared.

The prosecutor then asked the jury to convict Casillas of the robbery charge based on the natural and probable consequences doctrine. Specifically, the prosecutor argued Casillas and Martinez were guilty of the charged burglary, Martinez committed the robbery during that burglary, and "a reasonable person in [Casillas's] position would have known that [Martinez's] commission of the robbery was a natural and probable consequence of the burglary. [¶] . . . [T]his is why it was reasonably foreseeable: [W]hen you commit a burglary in somebody's house where there are multiple people living, it is not just reasonably foreseeable but incredibly likely that someone is going to come home at some point. . . . [T]hat initial theft where you were trying to take items from the house would turn into a robbery because the occupants confronted you and because they prevented you somehow from taking their property. [¶] And how do we know [Casillas and Martinez] even considered that possibility? Because they brought a shotgun with them. You don't bring a shotgun to a house where you're going to commit a burglary unless you anticipate someone coming home and perhaps resisting or preventing you from taking something. That there would be a confrontation. And that shotgun is critical evidence of that knowledge, that reasonable, foreseeable fact that a robbery could occur during the course of a burglary."

As pertinent here, the jury found both Casillas and Martinez guilty of first degree robbery in an inhabited dwelling and first degree residential burglary. The jury found not

8

true the allegations that Casillas personally used a firearm during the commission of the burglary and robbery.

B. *Applicable Legal Principles*

1. *Elements of robbery*

Section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

"The element of fear for purposes of robbery is satisfied when there is sufficient fear to cause the victim to comply with the unlawful demand for his property." (*People v. Ramos* (1980) 106 Cal.App.3d 591, 601-602, disapproved on other grounds in *People v. Scott* (1994) 9 Cal.4th 331, 353, fn. 16; *People v. Smith* (1995) 33 Cal.App.4th 1586, 1595.) The requisite fear need not be the result of an express threat or the use of a weapon. (*People v. Brew* (1991) 2 Cal.App.4th 99, 104; *People v. Flynn* (2000) 77 Cal.App.4th 766, 771.) All that is necessary is that the record show """conduct, words, or circumstances reasonably calculated to produce fear . . . .""" (*Brew*, *supra*, 2 Cal.App.4th at p. 104.) Intimidation of the victim equates with fear. (*People v. Davison* (1995) 32 Cal.App.4th 206, 214.)

2. *Natural and probable consequences doctrine*

"Aider-abettor liability exists when a person who does not directly commit a crime assists the direct perpetrator by aid or encouragement, with knowledge of the perpetrator's criminal intent and with the intent to help him [or her] carry out the

9

offense."  (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407, citing *People v. Beeman* (1984) 35 Cal.3d 547, 560–561.)

"The liability of an aider and abettor extends also to the natural and [probable] consequences of the acts [the defendant] knowingly and intentionally aids and encourages."  (*People v. Beeman*, *supra*, 35 Cal.3d at p. 560; see *People v. Prettyman* (1996) 14 Cal.4th 248, 260.)  "Under the natural and probable consequences doctrine, an aider and abettor is guilty of not only the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the actual perpetrator.  The defendant's knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator."  (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407-408.)

The elements of aider and abettor liability under the natural and probable consequences doctrine are:  (1) the defendant "by act or advice aided, promoted, encouraged, or instigated the commission of the intended target crime"; (2) the defendant acted with knowledge of the perpetrator's unlawful purpose; (3) the defendant acted with the intent or purpose either to commit, or to facilitate or encourage commission of, the target crime; (4) "the defendant's confederate committed an offense (the nontarget offense) other than the target crime" (italics omitted); and (5) "the [nontarget] offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted.:"  (*People v. Prettyman, supra,* 14 Cal.4th at p. 262; *People v. Miranda*, *supra*, 192 Cal.App.4th at p. 408.)

10

In determining whether the nontarget offense committed by the defendant's confederate was a natural and probable consequence of the target crime the defendant aided and abetted, the question is not whether the defendant *actually* foresaw the confederate's commission of the nontarget offense, but whether, judged objectively, the commission of the nontarget crime was *reasonably* foreseeable. (*People v. Medina* (2009) 46 Cal.4th 913, 920; *People v. Miranda*, *supra*, 192 Cal.App.4th at p. 408.) Thus, "[l]iability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " (*People v. Medina*, at p. 920, quoting *People v. Nguyen* (1993) 21 Cal.App.4th 518, 535.)

To be reasonably foreseeable, the consequence of the confederate's act "''need not have been a strong probability; a *possible* consequence which might reasonably have been contemplated is enough."'' (*People v. Medina*, *supra*, 46 Cal.4th at p. 920, quoting *People v. Nguyen*, *supra*, 21 Cal.App.4th at p. 535, italics added.)

Whether the consequence of the confederate's act was reasonably foreseeable is a factual issue to be resolved by the jury based on its evaluation of all the factual circumstances of the individual case. (*People v. Medina*, *supra*, 46 Cal.4th at p. 920.)

3. *Substantial evidence standard of review*

When assessing a challenge to the sufficiency of the evidence supporting a conviction, we apply the substantial evidence standard of review, under which we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid

11

value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

C. *Analysis*

Casillas does not dispute that he and Martinez committed the burglary or that Martinez robbed Gloria. He claims his robbery conviction must be reversed because, "[b]ased on the facts of this case, [he] did not commit a robbery because Martinez's actions were clearly an independent choice" she made while he and Gilbert were fighting inside the house. He asserts "[t]he evidence overwhelming[ly] showed that Martinez independently panicked during the incident, took the purse without thinking, and then threw it away a couple of houses down the street"; and, thus, the robbery "was not a natural and probable consequence of the planned theft." He also asserts the burglary was "not an 'armed burglary'" because the jury rejected the prosecution's theory that he was in possession of a firearm.

12

Viewing the evidence in the light most favorable to the judgment, as we must (*Jackson v. Virginia*, *supra*, 443 U.S. at p. 319; *People v. Johnson*, *supra*, 26 Cal.3d at p. 578), we conclude any reasonable trier of fact could find beyond a reasonable doubt that a reasonable person in Casillas's position would have or should have known that the robbery was a foreseeable consequence of the burglary. The Trujillos' testimony and that of their son established that Casillas and Martinez broke into the Trujillos' home, where their adult son also lived, in the middle of the afternoon, intending to steal property because the Trujillos' son owed Casillas some money.[6] A reasonable person in Casillas's position might reasonably have contemplated it was possible that one or more of the residents would return to the home while Casillas and Martinez were inside the home, that a confrontation and altercation might ensue, that the residents would be intimidated and fearful, and that Martinez would take advantage of these circumstances to carry out their criminal intent by stealing property belonging to the Trujillos. Thus, substantial evidence supports a finding that the robbery Martinez perpetrated was a possible, reasonably foreseeable consequence of the burglary. (See *People v. Medina*, *supra*, 46 Cal.4th at p. 920 [the consequence of the confederate's act ""need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough.""].)

---

[6] The Trujillos' son testified for the defense that he knew Casillas and owed him money in January 2011. Casillas and Martinez committed their crimes in this matter on January 18, 2011.

It is true, as Casillas points out, that the jury rejected the prosecution's theory he was in possession of a firearm during the incident. In her closing arguments, Casillas's counsel argued that the police did not find a firearm, that neither Gilbert nor Gloria could describe the weapon they testified Casillas pointed at them, and that the prosecutor "ha[d] not proved . . . beyond a reasonable doubt that [Casillas] had a weapon, had a rifle in his possession." The jury apparently agreed and found not true the sentence enhancement allegations that Casillas personally used a firearm during the commission of the burglary and robbery.

However, Casillas's contention that his robbery conviction must be reversed because the burglary he and Martinez committed was not an "armed burglary," is unavailing. We have already concluded that substantial evidence—apart from both the Trujillos' testimony that Casillas pointed a shotgun or rifle at them and the evidence establishing that the police found a live 12-gauge shotgun shell along with Casillas's wallet and identification in the same pocket of the pair of jeans found in the van he and Martinez stole—supports a finding that the robbery was a reasonably foreseeable consequence of the burglary they committed in this matter.

## II. *CLAIM OF INSTRUCTIONAL ERROR* (*ROBBERY*)

Casillas also contends his robbery conviction must be reversed because the court erred by failing to sua sponte instruct the jury on theft as a lesser included offense of robbery. This contention is unavailing.

A. *Background*

As already discussed, Casillas was prosecuted under a theory of aiding and abetting and the natural and probable consequences doctrine for the robbery of Gloria actually perpetrated by Martinez. As pertinent here, the court instructed the jury on the elements of robbery, aiding and abetting, and the natural and probable consequences doctrine. As Casillas correctly points out, the court did not give an instruction on theft as a lesser included offense of robbery.

B. *Applicable Legal Principles*

1. *Theft as a lesser included offense*

Theft is a lesser included offense of robbery because theft "comprises the same elements, including intent to steal, with the pertinent exception of the use of force or fear." (*People v. Waidla* (2000) 22 Cal.4th 690, 737.)

2. *Duty to sua sponte instruct on lesser included offenses*

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744 (*Blair*).) "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." (*Id.* at p. 745; see also *People v. DePriest* (2007) 42 Cal.4th 1, 50 ["Such instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense."].)

15

"To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*Blair*, *supra*, 36 Cal.4th at p. 745; see also *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) "'In deciding whether evidence is "substantial" in this context, a court determines only its bare legal sufficiency, not its weight.'" (*People v. Moye* (2009) 47 Cal.4th 537, 556.)

3. *Standard of review*

We review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

C. *Analysis*

We shall assume, without deciding, that the court erred by failing to sua sponte instruct the jury on the lesser included offense of theft. The People urge us to conclude that any such error was harmless under the *Watson* test for prejudice (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)), which the California Supreme Court in *Breverman*, *supra*, 19 Cal.4th at pages 177–178 made applicable to instructional errors of this sort in noncapital cases. (See *People v. Moye*, *supra*, 47 Cal.4th at p. 555.)

Under the *Watson* test, an error in failing sua sponte to instruct on a lesser included offense requires reversal of the conviction for the greater offense "if, 'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*Breverman*, *supra*, 19 Cal.4th at p. 178.) Probability under *Watson* "does not

16

mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918.) *Breverman* explained that appellate review under *Watson* "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman*, at p. 177.)

Here, Casillas has failed to meet his burden of showing a reasonable probability under *Watson* that he would have obtained a more favorable outcome had the court sua sponte instructed the jury on theft as a lesser included offense of robbery. The evidence supporting Casillas's robbery conviction under the natural and probable consequences doctrine (discussed, *ante*) is relatively strong, and the evidence that only a theft of Gloria's purse ─committed (by definition) without force or fear─was a reasonably foreseeable consequence of the residential burglary, is comparatively weak, that there is no reasonable probability the instructional error of which he complains affected the result. As already noted, Casillas's robbery conviction was based on his aiding and abetting Martinez's theft of Gloria's purse, and on the natural and probable consequences doctrine. After Casillas became involved in a physical altercation with Gilbert, Martinez grabbed the telephone out of Gloria's hand as Gloria was trying to call 911 and threw it in

17

the hallway; told Gloria, "You['re] not calling nobody"; then snatched Gloria's purse from her arm and ran out of the house.

We conclude Casillas's claim that the court erred by failing to sua sponte instruct the jury on theft as a lesser included offense of robbery, is unavailing. On the evidentiary record presented here, there was no basis for the jury to conclude that Martinez's theft of the purse was reasonably foreseeable, but that it was *not* reasonably foreseeable force or fear would be used to perpetrate that theft.

### III. *SECTION 654*

Last, Casillas contends the court erred by not staying under section 654 the execution of the consecutive term of one year four months it imposed for his conviction for unlawfully taking or driving a motor vehicle because his taking of Asher's van was intended to be a means of fleeing from the Trujillos' home and completing the residential burglary and robbery offenses. We reject this contention.

#### A. *Background*

Casillas was convicted of robbery and unlawful taking of a vehicle. During the sentencing hearing, Casillas's attorney asked that the recommended one-year-four-month sentence for that conviction run concurrently, not consecutively. Casillas's counsel did not ask that the execution of the sentence imposed for that conviction be stayed under section 654.

As pertinent here, the court sentenced Casillas to a term of eight years for his robbery conviction and a consecutive term of one year four months for his conviction of

18

unlawful taking of a vehicle. The court imposed, but stayed under section 654, an eight-year sentence for Casillas's first degree burglary conviction.

B. *Section 654*

Section 654, subdivision (a) provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 "precludes multiple punishment for a single act or omission, or an indivisible course of conduct" (*People v. Deloza* (1998) 18 Cal.4th 585, 591) and ensures the defendant's punishment will be commensurate with his or her criminal culpability (*People v. Kramer* (2002) 29 Cal.4th 720, 723). If a defendant suffers two convictions and punishment for one is barred by section 654, "that section requires the sentence for one conviction to be imposed, and the other *imposed and then stayed*." (*People v. Deloza*, at pp. 591-592, italics added.)

Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the defendant, not the temporal proximity of the offenses. (*People v. Hicks* (1993) 6 Cal.4th 784, 789.) Generally, if all the criminal acts were incident to one objective, then punishment may be imposed only as to one of the offenses committed. (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.)

19

The question of whether a defendant harbored multiple criminal objectives is a question of fact for the trial court to decide. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.)

1. *Standard of review*

In reviewing the trial court's determination whether section 654 precludes multiple punishment, we apply the deferential substantial evidence standard of review. (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) "The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*Hutchins, supra,* at p. 1312.) We must view the evidence in the light most favorable to the sentencing order and presume in support of that order the existence of every fact that reasonably could be deduced from the evidence. (*Id.* at pp. 1312-1313.)

When a trial court has not expressly determined whether section 654 applies but nevertheless imposes multiple punishment, we infer that the court has made a determination that section 654 does not apply (i.e., that the defendant had more than one objective in committing multiple offenses). (See *People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

C. *Analysis*

In support of his claim that the court erred by not staying under section 654 the sentence it imposed for his conviction of unlawfully taking Asher's van and citing *People v. Bauer* (1969) 1 Cal.3d 368 (*Bauer*), Casillas asserts that, "[b]ecause [he and Martinez]

never reached a place of temporary safety[,] the vehicle theft constituted an indivisible course of action with the [burglary and robbery] offenses," and, thus, "section 654 barred separate punishment for the vehicle theft."  Stating that "the record did not show that [he and Martinez] had reached a location of temporary safety when they took the van," he asserts "[t]he record also does not show that [they] harbored a separate criminal purpose or committed a separate gratuitous act in taking the van."

The California Supreme Court has explained that "'[a] robbery is not complete until the perpetrator reaches a place of temporary safety . . . ,' which is not the scene of the robbery."  (*People v. Wilson* (2008) 43 Cal.4th 1, 17, quoting *People v. Young* (2005) 34 Cal.4th 1149, 1177; see also *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1375 ["[t]he scene of a robbery is not a place of temporary safety"].)

Here, the record shows Casillas and Martinez had reached a place of temporary safety, and thus their commission of the burglary and robbery offenses was complete, when they entered Asher's van—which was parked in the driveway of Asher's home on Linnet Street—and drove it away.  Specifically, the record shows the burglary and robbery occurred at the Trujillo's home on Thrush Street in San Diego.  Gloria testified that, after Martinez took her purse, she (Gloria) used a neighbor's telephone to call the police after she saw Martinez running up Thrush Street.  Detective Jason Rocha of the San Diego Police Department testified that this call was made at 3:01 p.m.  The record also shows that about 10 minutes later Asher watched someone (i.e., Casillas and Martinez) get into his van and drive away, and about a minute later he called 911 to

21

report the vehicle theft. Detective Rocha testified the stolen vehicle call came in at 3:11 p.m.

Thus, the foregoing substantial evidence shows that Casillas and Martinez unlawfully took the van on a street other than the street where they committed the burglary and robbery and did so about 10 minutes after Gloria called 911 to report the crimes. This evidence is sufficient to support a reasonable inference that Casillas and Martinez had reached a place of temporary safety when they unlawfully took Asher's van; and, thus, for purposes of section 654, this crime was not part of an indivisible course of conduct that began with their burglary and robbery offenses.

Casillas's reliance on *Bauer*, *supra*, 1 Cal.3d 368, is unavailing because that case is factually distinguishable. In *Bauer*, the defendant and an accomplice gained entrance into the home of three elderly women by pretending to be gas company employees who wished to check the stove, tied the women up, ransacked the home, carried personal property belonging to the victims to the garage, loaded the property into a car belonging to one of the victims, and drove away in the car. (*Id*. at p. 372.) A jury convicted the defendant of first degree burglary, first degree robbery, grand theft, and automobile theft. (*Id*. at p. 371.) On appeal, the Attorney General claimed the separate sentences imposed for the robbery and car theft convictions should be upheld because the robbery was complete before the car theft began and the theft of the automobile was an afterthought. (*Id*. at p. 377.) The *Bauer* court rejected this claim, explaining that "[t]he fact that one crime is technically complete before the other commenced does not permit multiple punishment where there is a course of conduct comprising an indivisible transaction.

22

[Citations.]  And *the fact that one of the crimes may have been an afterthought does not permit multiple punishment where there is an indivisible transaction*."  (*Ibid*., italics added.)

In *Bauer*, the defendant stole the car *from one of the robbery victims at the scene of the robbery*.  (*Bauer*, *supra*, 1 Cal.3d at p. 372.)  The scene of a robbery is not a place of temporary safety for the robbers.  (*People v. Wilson*, *supra*, 43 Cal.4th at p. 17.)  Here, in contrast, Casillas unlawfully took the van from a victim (Asher) who was *not* one of the robbery victims (the Trujillos), and he took the van *not* at the scene of the robbery, but from the driveway of a home (Asher's) located on another street about 10 minutes after one of the robbery victims (Gloria) called 911 to report the robbery.  Casillas, unlike the *Bauer* defendant, unlawfully took the vehicle after reaching a place of temporary safety.

The evidence also shows Casillas and Martinez took Asher's van after Casillas found and took the keys to the vehicle, which were conveniently hanging in the lock of the nearby gate where Asher had temporarily left them.  Casillas took advantage of this easy opportunity to steal a van.

In sum, substantial evidence supports the court's implied findings that Casillas harbored multiple criminal objectives and that the burglary and robbery at the Trujillo's home and the unlawful taking of Asher's van were not all part of one indivisible course of conduct.  Imposition and execution of separate punishment for Casillas's unlawful taking of Asher's van serves the important legislative purpose of section 654 of ensuring his punishment will be commensurate with his criminal culpability.  (See *People v. Kramer*,

23

*supra*, 29 Cal.4th at p. 723.)  Accordingly, we conclude section 654 does not bar execution of the punishment the court imposed for Casillas's conviction for unlawfully taking or driving a motor vehicle.

## DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.